693 A.2d 904

ELEANOR BAIRD, PLAINTIFF–APPELLANT, AND JOHN BAIRD, PLAINTIFF, v. AMERICAN MEDICAL OPTICS, FREDERIC NEWMAN, M.D., VALLEY HOSPITAL, XYZ COMPANIES #1 THROUGH #5, JOHN DOES #1 THROUGH #5, DEFEN-DANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 14, 1997—Decided May 12, 1997.

8

Before Judges PRESSLER, STERN and HUMPHREYS.

*Richard Galex* argued the cause for appellant (*Galex, Tortoreti* and *Tomes,* attorneys; *Mr. Galex,* on the brief).

*Melissa Feldman Michalsky* argued the cause for respondent American Medical Optics (*Feldman & Fiorello,* attorneys; *Ms. Michalsky* and *Steven A. Yomtov,* on the brief).

*Julia A. Klubenspies* argued the cause for respondent Frederic Newman, M.D. (*McDonough, Korn, Eichhorn & Boyle,* attorneys; *R. Scott Eichhorn,* of counsel; *Ms. Klubenspies* and *AnnMarie West,* on the brief).

*Daniel B. Frier* argued the cause for respondent Valley Hospital (*Giblin & Combs,* attorneys; *E. Burke Giblin* and *Mr. Frier,* on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

Plaintiff Eleanor Baird appeals from the dismissal of her complaint filed in February 1992 against the manufacturer of her intraocular lens (IOL), American Medical Optics (AMO), the physician who implanted it during surgery in 1983, Frederick Newman, M.D., and the hospital where the operation occurred, Valley Hospital. The case against the IOL manufacturer was dismissed on grounds of federal preemption. The hospital was granted summary judgment based on its lack of duty to obtain "informed consent." The case against Dr. Newman was dismissed on statute of limitations grounds because the trial judge concluded after a *Lopez* hearing,[1] that the plaintiff's cause of action accrued "no later than 1987." The judge who dismissed the action against

---

[1] *Lopez v. Swyer,* 62 *N.J.* 267, 300 A.2d 563 (1973).

Newman reasoned that plaintiff "was well-aware that she had a problem, she was well-aware that it came from the surgery," became "dissatisfied with the treatment by Dr. Newman" shortly after the surgery, and "switched to other physicians" by 1985.

We reverse the grant of summary judgment to each defendant.

I.

In 1983, Eleanor Baird (plaintiff) consulted Dr. Newman, an ophthalmologist, because she was "having trouble" with the vision in her left eye. Upon examination, Dr. Newman explained to her that she had a cataract in her left eye. Plaintiff testified that, upon diagnosis, Dr. Newman "said [she] was going to need an operation, have the cataract removed and an implant put in." Plaintiff further testified that aside from arrangements to go to the hospital, "[n]othing much" was explained to her about the implant. According to plaintiff, Dr. Newman never asked if she would "participate in a study to determine if the lens is safe." Plaintiff maintains that she would not have "participated," if she had been asked. She also asserts that the doctor never "told [her] that the lens was not approved," and that she would not have "submitted to the surgery" if she knew that.

Dr. Newman removed the cataract on November 8, 1983 and implanted the IOL in plaintiff's left eye. Plaintiff testified that after the surgery Dr. Newman advised plaintiff and her husband that she "would have to stay [in the hospital for] at least three days because there was a problem. He never told me what the problem was or anything." Plaintiff continued to have problems with her eye, consulted other doctors and ultimately learned in the late 1980's that the sight in her left eye "was gone."

One of plaintiff's daughters, who attended to her during the surgery and related hospitalization and on subsequent visits to Dr. Newman, testified that the doctor never told her mother that the lens was not FDA approved; that her father would never have allowed her mother to receive an experimental lens in her eye, and that Dr. Newman never told her that anything was wrong with the

lens. Another daughter testified that she "never thought Dr. Newman would ... give her the lens that wasn't approved."

On March 24, 1991, plaintiff read an article in the *Bergen Record* regarding problems with IOLs. Because the problems "sounded so much like what [she] had experienced," she contacted an attorney. Upon subsequent inquiry, plaintiff learned that an experimental IOL had been implanted in her eye.

It is uncontested that plaintiff signed an "Informed Consent Form for Cataract Operation and/or Implantation of Intraocular Lenses" indicating the risks of the implant surgery and detailing alternatives. Plaintiff signed the line "I wish to have a cataract operation with an intraocular implant." The form contained information to the effect that plaintiff understood she was "tak[ing] part" in a "clinical investigation." At the *Lopez* hearing, plaintiff acknowledged signing the form, but said she did not "remember" doing it and insisted that neither the doctor nor the nurse explained the form to her.

## II.

We reverse the grant of summary judgment to Dr. Newman for the reasons detailed in *Lombardo v. Borsky*, 298 *N.J.Super.* 658, 690 *A*.2d 150 (App.Div.1997). We remand for further consideration of the informed consent claim against him.[2] *Lombardo* involved a similar claim and we reversed on discovery-rule grounds. In this case, as in *Lombardo*, there is no contest as to when plaintiff learned of the implantation of an experimental lens. The motion judge expressly found that plaintiff "was very candid ... [and] straight-forward with the Court."

It is undisputed that plaintiff was not aware the implanted lens was an experimental IOL until March 1991 and her complaint was filed within a year thereafter. Under these circumstances, the

---

[2] Another trial judge previously found no preemption of the informed consent claim because "[i]nformed consent claims are expressly exempted from the effects of federal preemption under 21 *C.F.R.* § 50.25(c)."

statute of limitations does not bar plaintiff's action against Dr. Newman.

### III.

We have found no cases, and are cited to none, in which the courts of New Jersey have recognized the obligation of a hospital to obtain informed consent before permitting surgery at its facility. *See Lombardo v. Borsky, supra,* 298 *N.J.Super.* at 661 n. 1, 690 *A.*2d 150. The hospital must generally rely on the relationship between a patient and his or her physician and not interfere with or intervene in that relationship. However, plaintiff argues that there is such a duty when a hospital elects to permit an FDA experimental investigation to go forward on its premises. *See Friter v. Iolab Corp.,* 414 *Pa.Super.* 622, 607 *A.*2d 1111 (1992); *but see Kershaw v. Reichert,* 445 *N.W.*2d 16 (N.D.1989).

Whether the duty exists may depend on the facts, the relationship between the hospital and doctor and the ultimate findings regarding the doctor's conduct. We therefore conclude that the issue should be decided after development of a full record. *See Wolfsbruck v. Dow Chemical Co.,* 101 *N.J.* 252, 501 *A.*2d 924 (1985); *Salomon v. Eli Lilly & Co.,* 98 *N.J.* 58, 61, 484 *A.*2d 320 (1984); *Jackson v. Muhlenberg Hospital,* 53 *N.J.* 138, 249 *A.*2d 65 (1969).

### IV.

A motion judge held "that plaintiff's cause of action for manufacturing and design defects is preempted." He similarly held with respect to plaintiff's claims of breach of warranty and fraudulent misrepresentation claims. We find no basis for dismissing plaintiff's complaint against AMO on summary judgment.

The federal Medical Devices Amendments of 1976(MDA) to the Federal Food Drug and Cosmetic Act of 1938 (FDCA) "classifies medical devices in three categories based on the risk they pose to the public." Class I devices "present no unreasonable risk of

illness or injury" and "are subject only to minimal regulation." 21 *U.S.C.* § 360c(a)(1)(A)(ii)(II). *Medtronic, Inc. v. Lohr,* —— *U.S.* ——, ——, 116 *S.Ct.* 2240, 2246, 135 *L.Ed.*2d 700 (1996). Class II devices are "potentially more harmful" and must comply with additional federal regulations known as "[s]pecial [c]ontrols." 21 *U.S.C.* § 360c(a)(1)(B); *Medtronic, supra,* —— *U.S.* at ——, 116 *S.Ct.* at 2246, 135 *L.Ed.*2d at 709–10. Class III devices are those "that either present a potential unreasonable risk of illness or injury, or which are purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health. 21 *U.S.C.* § 360c(a)(1)(C)." *Medtronic, supra,* —— *U.S.* at ——, 116 *S.Ct.* at 2246, 135 *L.Ed.*2d at 710.

IOLs are products classified and regulated by the Federal Food and Drug Administration (FDA) as Class III medical devices. 21 *C.F.R.* § 886.3600(b). "Before a new Class III device may be introduced to the market, the manufacturer must provide the FDA with 'a reasonable assurance' that the device is both safe and effective." *Medtronic, supra,* —— *U.S.* ——, 116 *S.Ct.* at 2246, 135 *L.Ed.*2d at 710, 21 *U.S.C.* § 360e(d)(2) ("Action on application for premarket approval"). This process for establishing "reasonable assurance" is known as the "premarket approval" or PMA process. *Medtronic, supra,* —— *U.S.* at ——, 116 *S.Ct.* at 2246–47, 135 *L.Ed.*2d at 709–12.

It is undisputed before us that in order to obtain an investigational device exemption (IDE) incident to the PMA process, a manufacturer must apply to the FDA and receive permission to undertake investigations. 21 *U.S.C.* § 360j(g)(2)(A) ("exemption for device for investigational use"). To that end, the FDA has promulgated specific regulations regarding the development and use of IOLs. *See generally* 21 *C.F.R.* § 813.20 *et seq.*

The parties agree that in advance of plaintiff's surgery, the FDA granted AMO an IDE, permitting it to conduct a "clinical investigation" of the type of IOL implanted in this case. It is also undisputed that incident thereto Valley Hospital formed an Inves-

tigational Review Board (IRB) to monitor the investigational study to be conducted at the hospital. Various eye surgeons, including Dr. Newman, took part in the clinical investigation as "investigators."

The MDA specifically addresses "state and local requirements" with respect to medical devices. Section 360k(a) provides in relevant part that:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.
>
> [21 *U.S.C.* § 360k(a).]

In *Medtronic*, decided after the orders under review were entered, the United States Supreme Court held that a plaintiff's state common-law "design claims" and "manufacturing and labeling claims" resulting from an allegedly defective pacemaker regulated as a Class III device were not preempted by section 360k. —— *U.S.* at ——, 116 *S.Ct.* at 2240–58, 135 *L.Ed.*2d at 700–26. That case dealt with a provision of the MDA that grandfathered devices which had been marketed before the MDA was enacted in 1976, and provided that devices "substantially equivalent" thereto could "be marketed without the rigorous PMA review" by the filing of a "premarket notification" to the FDA. *Id.* at ——, 116 *S.Ct.* at 2247, 135 *L.Ed.*2d at 710–12. The Court was divided in its approach to resolution of the preemption issue, and the opinions emphasized that the "design claim" had to be evaluated on the basis that the "substantially equivalent" devices had "never been formally reviewed [by the FDA] under the MDA for safety or efficacy." *Id.* at ——, 116 *S.Ct.* at 2254, 135 *L.Ed.*2d at 720–21; *see also id.* at ——, 116 *S.Ct.* at 2263–64, 135 *L.Ed.*2d at 731–34 (O'Connor, J., concurring and dissenting). However, the Court was unanimous in finding no preemption of the "defective design claim," and a majority found no preemption of the "manufacturing and labeling claims."

■ Thus, under *Medtronic* all state common-law claims are not preempted. Moreover, we read five members of the *Medtronic* Court to find preemption only to the extent that the FDA has adopted a regulation inconsistent with or in conflict with a requirement of state law.[3]

In Part IV of the four Justice *Medtronic* plurality opinion, which Justice Breyer did not join, Justice Stevens concluded that:

> The legislative history ... confirms our understanding that § 360(k) simply was not intended to pre-empt most, let alone all, general common-law duties enforced by damage actions. There is, to the best of our knowledge, nothing in the hearings, the committee reports, or the debates suggesting that any proponent of the legislation intended a sweeping pre-emption of traditional common-law remedies against manufacturers and distributors of defective devices.
>
> [*Id.* at ——, 116 *S.Ct.* at 2253, 135 *L.Ed.*2d at 719.]

Justice Breyer appears to disagree, stating:

> I believe that ordinarily insofar as the MDA pre-empts a state requirement embodied in a state statute, rule, regulation or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action. It is possible that the plurality also agrees on this point, although it does not say so explicitly.
>
> [*Id.* at ——, 116 *L.Ed.*2d at 2260, 135 *L.Ed.*2d at 727 (Breyer, J. concurring).]

Justice O'Connor in her concurring and dissenting opinion on behalf of four members of the Court concluded "that state common-law damages actions do impose 'requirements' and are therefore pre-empted where such requirements would differ from those imposed by the FDCA." *Id.* at ——, 116 *S.Ct.* at 2262, 135 *L.Ed.*2d at 730. She disagreed with the plurality that "common-law claims [would be] almost never pre-empted." *Ibid.*

In Part VI of *Medtronic* the plurality declined to "directly" pass upon the argument that the MDA "never pre-empts common-law actions." *Id.* at ——, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 726. It did so because none of the claims involved in the case were pre-

---

[3] The parties do not suggest that our *Products Liability statute, N.J.S.A.* 2A:58C–1 to –7, affects what may be deemed a "common-law" claim for purposes of the issue before us. Note, however, that the statute contains provisions specifically relating to the issue of liability in light of FDA approvals. *N.J.S.A.* 2A:58C–4, –5.

empted and because it was "apparent that few, if any, common-law duties have been pre-empted by this statute." *Ibid.* In his concurrence Justice Breyer, like those joining Justice O'Connor, also disagreed with this observation. Justice Breyer specifically said, "I do not join Part VI, because I am not convinced that future incidents of MDA pre-emption of common-law claims will be 'few' or 'rare.'" *Id.* at ——, 116 *S.Ct.* at 2262, 135 *L.Ed.*2d at 731. It is clear, therefore, that Justice Breyer, although joining portions of the plurality opinion, also joined the dissenters to forge a majority for the proposition that state common-law claims can be pre-empted by the MDA.

In a portion of part V of the plurality opinion regarding "manufacturing and label claims," in which Justice Breyer joined to form a majority, *id.* at ——————, 116 *S.Ct.* at 2261–62, 135 *L.Ed.*2d at 729–31, Justice Stevens wrote:

> Although we do not believe that [the] statutory and regulatory language necessarily precludes "general" federal requirements from ever pre-empting state requirements, or "general" state requirements from ever being pre-empted, see Part VI, infra [which, as noted, Justice Breyer did not join], it is impossible to ignore its overarching concern that *pre-emption occur only where a particular state requirement threatens to interfere with a specific federal interest.* State requirements must be "with respect to" medical devices and "different from, or in addition to" federal requirements. State requirements must also relate "to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device," and the regulations provide that state requirements of "general applicability" are not pre-empted except where they have "the effect of establishing a substantive requirement for a specific device." Moreover, federal requirements must be "applicable to the device" in question, and, according to the regulations, pre-empt state law only if they are "specific counterpart regulations" or "specific" to a "particular device." The statute and regulations, therefore, require a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations.
>
> [*Id.* at ——————, 116 *S.Ct.* at 2257–58, 135 *L.Ed.*2d at 724–25 (emphasis added).]

Moreover, the plurality joined by Justice Breyer noted that "the general state common-law requirements involved in *Medtronic* 'were not specifically developed "with respect to" medical devices' and were, therefore, not the kinds of requirements that Congress

and the FDA feared would impede the ability of federal regulations to implant and enforce specific federal requirements," *id.* at ——, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725.

We conclude from the foregoing analysis that Point V of the *Medtronic* plurality opinion embodies the prevailing approach governing preemption of design claims (with respect to a new as well as a "substantially equivalent" device to which the above-quoted language was addressed), manufacturing and labeling claims, and all other state-law claims.[4]

Furthermore, recent cases have not read *Medtronic's* holding to be limited to "substantially equivalent" devices. The Missouri Supreme Court recently found no pre-emption of state law claims for negligence, strict liability, failure to warn, failure to obtain informed consent and fraud against another manufacturer of an intraocular lens. *See Connelly v. Iolab Corp.*, 927 S.W.2d 848, 854 (Mo.1996). After analyzing the opinions in *Medtronic*, the Missouri Court concluded that "none of plaintiff's claims are preempted" under either the plurality or concurring opinions. *Ibid.* See also Judge Brochin's thoughtful discussion of *Medtronic* in distinguishing between the analysis necessary to resolve preemption issues under the Federal Insecticide, Fungicide and Rodenticide

---

4 Although speaking in the context of a claim that *Medtronic* violated FDA regulations, the plurality—joined by Justice Breyer—also said:

> Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements. Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they created an unreasonable hazard for users of the product, such additional elements of the state-law cause of action would make the state requirements narrower, not broader, than the federal requirement. While such a narrower requirement might be "different from" the federal rules in a literal sense, such a difference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule. The presence of a damages remedy does not amount to the additional or different "requirement" that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing "requirements" under federal law.
>
> [*Id.* at ——, 116 *S.Ct.* at 2255, 135 *L.Ed.*2d at 722.]

Act (FIFRA) and the MDA. *Lewis v. American Cyanamid Co.,* 294 *N.J.Super.* 53, 682 *A.*2d 724 (App.Div.1996).[5]

■ In sum, we find no bar to plaintiff's state-law claims on this record. Defendant AMO points to no element of any cause of action nor to any proofs offered in support of plaintiff's state-law claims which conflict with or are inconsistent with a requirement imposed by federal law or FDA regulation. In the absence of such a showing, there is no basis for the assertion of preemption as a matter of law.

We agree with the reasoning and conclusion of the California Court of Appeals regarding the absence of federal preemption of negligence and strict liability defect and warranty claims related to the implantation of an IOL:

> The negligence claim is not preempted for two reasons. First, as ORC [the manufacturer] acknowledges, it is subject to FDA regulations with respect to the functions and duties underlying Armstrong's claim (e.g., manufacturing, labeling). To the extent the negligence claim parallels federal requirements or is based on a violation of FDA regulations, it is not "different from, or in addition to" the duties mandated by federal law [citing *Medtronic,* —— *U.S.* at ——————, 116 *S.Ct.* at 2255–56, 135 *L.Ed.*2d at 721–23]. Second, the state law requirements imposed by the negligence claim (e.g., the duty of a manufacturer to avoid foreseeable dangers in making a product or to inform users of potentially dangerous products of the risks involved) "were not specifically developed 'with respect to' medical devices." [Citing *Medtronic,* —— *U.S.* at ——, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725.] "These state requirements therefore escape pre-emption ... because their generality leaves them outside the category of requirements that § 360k envisioned to be 'with respect to' specific devices...." [Citing *Medtronic,* —— *U.S.* at ——, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725–26.]

> . . . .

> As with Armstrong's negligence claim, her theory of strict liability as to a manufacturing defect is based on general principles of state tort law which were not specifically developed with respect to medical devices. Thus it is not preempted. [Citing *Medtronic,* —— *U.S.* at ——, 116 *S.Ct.* at 2258, 135 *L.Ed.*2d at 725–26].

---

5 With respect to preemption generally, *see Board of Trustees of Operating Eng'rs Local 825 v. L.B.S. Construction Co.,* 148 *N.J.* 561, 691 *A.*2d 339 (1997); *Feldman v. Lederle Labs.,* 125 *N.J.* 117, 592 *A.*2d 1176 (1991) (finding no preemption of state tort or product liability claim by FDA regulation in the absence of actual conflict).

Further, section 360k "does not preempt a State or local requirement prohibiting the manufacture of adulterated ... devices" unless the prohibition would establish "a substantive requirement for a specific device" which conflicts with a federal requirement. Armstrong's principal contention, as disclosed in the parties' briefs, is that ORC failed to follow the *manufacturing protocol approved by the FDA*, resulting in the manufacturing defect. Plainly, if the manufacturing defect was the result of an error ORC made when producing Orcolon for commercial use, and not the result of a defect inherent in the FDA-approved manufacturing protocol, Armstrong's claim will not impose a requirement on the manufacture of Orcolon that conflicts with any federal requirement. Indeed, the gist of Armstrong's claim is that ORC did not comply with federally imposed manufacturing requirements.

As the plurality opinion noted in *Medtronic*: "[N]owhere in the materials relating to the [MDA's] history have we discovered a reference to a fear that product liability actions would hamper the development of medical devices. To the extent that Congress was concerned about protecting the industry, that intent was manifested *primarily through fewer substantive requirements* under the [MDA], not the pre-emption provision.... [Citing *Medtronic*, —— *U.S.* at ——, 116 *S.Ct.* at 2253, 135 *L.Ed.*2d at 718–19.] Accordingly, section 360k does not preempt Armstrong's strict liability claim based on manufacturing defect."

[*Armstrong v. Optical Radiation Corp.*, 50 *Cal.App.*4th 580, 594–97, 57 *Cal. Rptr.*2d 763 (1996) (footnotes and some citations omitted).]

*See also id.* at 596–97, 57 *Cal.Rptr.*2d 763; *Medtronic, supra,* —— *U.S.* at —— n. 18, 116 *S.Ct.* at 2258 n. 18, 135 *L.Ed.*2d at 723–24 n. 18 (regarding a breach of warranty claim).

## V.

We reverse the grants of summary judgment and remand for further proceedings as to each defendant.