[No. C021697. Third Dist. May 15, 1997.]

PATRICIA STEELE, Plaintiff and Appellant, v.
COLLAGEN CORPORATION, Defendant and Respondent.

## COUNSEL

Hersh & Hersh, Amy Eskin, Essmyer & Tritico, Susan A. Allinger and Michael M. Essmyer for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Kathleen D. Patterson and Kirk C. Jenkins for Defendant and Respondent.

## OPINION

**NICHOLSON, J.**—Federal preemption is a relatively simple concept, especially when Congress has explicitly provided the terms of preemption. (See *Brown v. Hotel Employees* (1984) 468 U.S. 491, 500-501 [104 S.Ct. 3179, 3184-3185, 82 L.Ed.2d 373, 382-383].) It provides order. Instead of having 50 or more standards with respect to a given human pursuit, there is one. When a preemptive federal standard is applied evenhandedly, it provides both the protection of the federal standard and some leeway to develop further state standards where the federal standard does not apply. With respect to medical devices that represent the highest risk to human life, the federal government imposes standards specific to each of those devices, and Congress has declared that the federal standard is preemptive.

Plaintiff Patricia Steele sued defendant Collagen Corporation, the maker of Zyderm Collagen Implants, because she developed an autoimmune disorder after receiving a test injection of Zyderm. The trial court concluded that all of her causes of action were preempted and granted Collagen Corporation's motion for summary judgment. We reverse and remand because, even though there is an applicable federal regulatory standard of care for the design, manufacture, and marketing of Zyderm, it is unclear whether Steele asserts Collagen Corporation violated the federal regulatory standard of care or it violated a preempted state common law tort standard of care.

### PROCEDURE

Steele sued Collagen Corporation alleging causes of action for strict liability, negligence, breach of implied warranty, breach of express warranty, fraud, and negligent misrepresentation against Collagen Corporation. She later amended her complaint adding a cause of action alleging unfair trade practices. The basis of her complaint is that Zyderm caused her to suffer from an autoimmune disorder.

Collagen Corporation moved for summary judgment. It asserted Steele's causes of action are preempted by the Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act because Zyderm was approved by the Food and Drug Administration (FDA). (See 21 U.S.C. §§ 360c, 360k.) In its separate statement of undisputed facts, Collagen Corporation claimed it had submitted Zyderm to the FDA for premarket approval and

that the FDA had given its approval, certifying that Zyderm "had been shown to be safe and effective for use as recommended in the submitted labeling." Collagen Corporation, however, did not claim as an undisputed fact that it had conformed to all of the requirements arising from the FDA approval. The trial court agreed that Steele's causes of action were pre-empted. It granted the motion for summary judgment and entered judgment in favor of Collagen Corporation.

Steele appeals.

## DISCUSSION

### I

### *The Medical Device Amendments*

In 1976, Congress enacted the MDA, which provided for the classification and regulation of devices intended for human use. (21 U.S.C. § 360c.) The most stringent controls apply to devices placed in class III under the MDA. "Before a new Class III device may be introduced to the market, the manufacturer must provide the FDA with a 'reasonable assurance' that the device is both safe and effective. See 21 U.S.C. § 360e(d)(2). Despite its relatively innocuous phrasing, the process of establishing this 'reasonable assurance,' which is known as the 'premarket approval,' or 'PMA' process, is a rigorous one. Manufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission. . . . [Citations.]" (*Medtronic, Inc.* v. *Lohr* (1996) 518 U.S. __ [116 S.Ct. 2240, 2246-2247, 135 L.Ed.2d 700, 710-711] (hereafter *Medtronic*).)

"Once the product receives PMA [premarket approval], the sponsor of the product may begin to market the product. Any subsequent changes in the product require submission of a PMA supplement application. (21 C.F.R. § 814.39 (1995).) Furthermore, to ensure continued validity of the PMA, the product sponsor is required to submit postapproval reports at one-year intervals, identifying any changes in the device or any reports from clinical investigation or scientific literature concerning the device. (21 U.S.C. § 360i; 21 C.F.R. § 814.84 (1995).)" (*Scott* v. *CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 315 [44 Cal.Rptr.2d 902].)

"Not all, nor even most, Class III devices on the market today have received premarket approval because of two important exceptions to the PMA requirement. First, Congress realized that existing medical devices

could not be withdrawn from the market while the FDA completed its PMA analysis for those devices. The statute therefore includes a 'grandfathering' provision which allows pre-1976 devices to remain on the market without FDA approval until such time as the FDA initiates and completes the requisite PMA. See 21 U.S.C. § 360e(b)(1)(A); 21 CFR § 814.1(c)(1). Second, to prevent manufacturers of grandfathered devices from monopolizing the market while new devices clear the PMA hurdle, and to ensure that improvements to existing devices can be rapidly introduced into the market, the Act also permits devices that are 'substantially equivalent' to pre-existing devices to avoid the PMA process." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2247, 135 L.Ed.2d at p. 711], fn. omitted.)

Zyderm is a class III device that received FDA premarket approval in 1981. In 1991, at the behest of Congressman John D. Dingell, the FDA reconsidered its 1981 approval of Zyderm. Congressman Dingell expressed concern that Zyderm caused adverse reactions in the immune system. After reconsidering Collagen Corporation's application, the FDA determined the market approval for Zyderm was appropriate.

## II

### Federal Preemption

■ Federal preemption is grounded in the supremacy clause of the United States Constitution and provides that a state law is preempted if Congress so intends. (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422].) Congress may make its intention explicit by including preemptive language in a law or it may imply preemption by the law's structure and purpose. (*Id.* at pp. 516-517 [112 S.Ct. at pp. 2617-2618, 120 L.Ed.2d at pp. 422-423].) Any state law that conflicts with a federal law is preempted. And any state law that invades a legislative field thoroughly occupied by federal law is also preempted. (*Ibid.*)

Federal laws may preempt not only state legislation but also state common law. Common law damage awards can be a potent method of governing conduct and imposing requirements on manufacturers. (*Cipollone* v. *Liggett Group, Inc., supra*, 505 U.S. at pp. 521-522 [112 S.Ct. at p. 2620].)

There is a presumption against federal preemption. (*Cipollone* v. *Liggett Group, Inc., supra*, 505 U.S. at pp. 523-524 [112 S.Ct. at p. 2621].)

## III

### Preemption Under the MDA

The MDA contains an explicit preemption provision: "[N]o State or political subdivision of a State may establish or continue in effect with

respect to a device intended for human use any requirement [¶] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." (21 U.S.C. § 360k(a) (hereafter § 360k).)

Construing section 360k, the FDA has promulgated the following regulation: "State or local requirements are preempted only when the [FDA] has established *specific counterpart regulations or there are other specific requirements applicable to a particular device* under the act, thereby making any existing divergent *State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements.* . . . [¶] (1) Section 521(a) [of the act] does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices. [¶] (2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act." (21 C.F.R. § 808.1(d) (1996), italics added.)

Most courts that have dealt with the issue of MDA preemption with respect to class III devices that have passed through the PMA process, including cases involving Zyderm, have concluded some or all state common law claims are preempted. (See, e.g., *Stamps* v. *Collagen Corp.* (5th Cir. 1993) 984 F.2d 1416; *King* v. *Collagen Corp.* (1st Cir. 1993) 983 F.2d 1130; *Scott* v. *CIBA Vision Corp., supra,* 38 Cal.App.4th at pp. 318-319.)

The United States Supreme Court recently decided a preemption case under the MDA. (*Medtronic, supra,* 518 U.S. __ [116 S.Ct. 2240].) Consequently, we requested supplemental briefing from the parties on the effect of that case.

Justice Stevens wrote the lead opinion, which is divided into seven sections. Four other justices, including Justice Breyer, joined him in five of the seven sections. Justice Breyer, however, did not join sections IV and VI of the lead opinion, leaving only three justices who joined Justice Stevens on those sections.

Section I summarized the law concerning class III devices and differentiated between class III devices subject to the PMA process and those subject only to the substantial equivalence test: "The § 510(k) notification process [substantial equivalence test] is by no means comparable to the PMA

process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours." (*Medtronic, supra*, at pp. __-__ [116 S.Ct. at pp. 2245-2248, 135 L.Ed.2d at pp. 709-712].)

In section II, the lead opinion set forth the facts and procedural history of the case. It noted the defendant was permitted to market the class III device in question, a pacemaker lead, because it was substantially equivalent to other products already on the market. Consequently, the device was not subjected to the PMA process. (*Medtronic, supra*, 518 U.S. at pp. __-__ [116 S.Ct. at pp. 2248-2250, 135 L.Ed.2d at pp. 712-714].)

Section III summarized federal preemption law. It recognized that analysis must begin with the text of the preemption statute, but that there is a presumption against preemption supporting a narrow interpretation of the statute. The lead opinion concluded that " '[t]he purpose of Congress is the ultimate touchstone in every pre-emption case.' . . ." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2250, 135 L.Ed.2d at p. 716], citations omitted.)

In section IV, rejected by Justice Breyer and thus representing the views of a minority of the court, Justice Stevens rebuffed the contention that all common law claims against manufacturers of class III devices are preempted. It stated: "Given the ambiguities in the statute and the scope of the preclusion that would occur otherwise, we cannot accept Medtronic's argument that by using the term 'requirement' [in § 360k(a)], Congress clearly signaled its intent to deprive States of any role in protecting consumers from the dangers inherent in many medical devices." Even though it stopped short of declaring that no common law claims are preempted under section 360k, the plurality indicated its opinion that most common law claims are not preempted. (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2251-2253, 135 L.Ed.2d at pp. 716-719].)

Section V, representing the majority of the court, dealt specifically with the common law claims asserted by the plaintiff and found none of them were preempted. For the purpose of analysis, the section broke the plaintiff's claims into three categories: (1) the design claim, (2) the identity of requirements claims, and (3) the manufacturing and labeling claims. (*Medtronic, supra*, 518 U.S. at pp. __-__ [116 S.Ct. at pp. 2253-2258, 135 L.Ed.2d at pp. 719-726].)

The defendant argued the plaintiff's design claim was preempted because the FDA's substantial equivalence finding as a prelude to permitting the defendant to market the product amounts to a "requirement" under section

360k. The court rejected this argument because the device had not been formally reviewed for safety and effectiveness. "[E]ven though the FDA may well examine § 510(k) [substantial equivalence] applications for Class III devices (as it examines the entire medical device industry) with a concern for the safety and effectiveness of the device, . . . it did not 'require' Medtronics' pacemaker to take any particular form for any particular reason; the agency simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed without running the gauntlet of the PMA process." (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2254, 135 L.Ed.2d at pp. 720-721].)

The court also held the plaintiff's common law claims were not preempted to the extent they rested on the violation of duties imposed by federal requirements: "Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements. Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they created an unreasonable hazard for users of the product, such additional elements of the state-law cause of action would make the state requirements narrower, not broader, than the federal requirement. While such a narrower requirement might be 'different from' the federal rules in a literal sense, such a difference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule. The presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law." (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2255, 135 L.Ed.2d at pp. 721-722].)

The court also found no preemption with respect to manufacturing and labeling claims based on a common law duty where there was no corresponding federal requirement specific to the device. The court of appeals had found those claims were preempted because the FDA has promulgated general labeling and manufacturing regulations applicable to all class III devices and further requirements imposed by the states would interfere with the consistent application of the federal regulations. The Supreme Court, however, rejected this reasoning. It held that the plaintiffs' claims were not preempted because "state requirements are pre-empted 'only' when the FDA has established 'specific counterpart regulations or . . . other specific requirements applicable to a particular device.' (21 CFR § 808.1(d) (1995).)" (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2257, 135 L.Ed.2d at p. 723].)

As to labeling and manufacturing claims, in general, the Supreme Court gave the following guidance: "Although we do not believe that this statutory

and regulatory language [section 360k and the FDA's implementing regulations] necessarily precludes 'general' federal requirements from ever preempting state requirements, or 'general' state requirements from ever being pre-empted, . . . it is impossible to ignore its overarching concern that pre-emption occur only where a particular state requirement threatens to interfere with a specific federal interest. State requirements must be 'with respect to' medical devices and 'different from, or in addition to' federal requirements. State requirements must also relate 'to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device,' and the regulations provide that state requirements of 'general applicability' are not pre-empted except where they have 'the effect of establishing a substantive requirement for a specific device.' Moreover, federal requirements must be 'applicable to the device' in question, and, according to the regulations, pre-empt state law only if they are . . . 'specific' to a 'particular device.' The statute and regulations, therefore, require a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2257-2258, 135 L.Ed.2d at pp. 724-725].)

Applying this seemingly interminable standard, the court found the requirements applicable to the class III device in question, which had not been through the PMA process, were entirely generic and the state common law duties the plaintiffs sought to enforce were not specific to the particular device. (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2258, 135 L.Ed.2d at p. 725].)

In section VI, also rejected by Justice Breyer and thus representing the views of a minority of the court, Justice Stevens concluded the FDA's reference to state requirements "established by . . . court decision" as being among those preempted referred only to court decisions construing state statutes and regulations. He opined: "It will be rare indeed for a court hearing a common-law cause of action to issue a decree that has 'the effect of establishing a substantive requirement for a specific device.' (21 CFR § 808.1(d)(6)(ii) (1995)." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2258-2259, 135 L.Ed.2d at p. 726].)

Section VII announced the judgment of the court.

Justice Breyer wrote a concurring opinion explaining his reasons for not joining sections IV and VI. He declared: "I believe that ordinarily, insofar as the MDA pre-empts a state requirement embodied in a state statute, rule,

regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2260, 135 L.Ed.2d at p. 727] (conc. opn. of Breyer, J.).) On the facts of the case, however, Justice Breyer concluded there was no preemption because he could find "no actual conflict between any federal requirement and any of the liability-creating-premises of the plaintiffs' state law tort suit . . . ." (*Id.* at p. __ [116 S.Ct. at p. 2261, 135 L.Ed.2d at p. 730].)

Justice Breyer explained it would be anomalous to prohibit a state from issuing regulations on a product but allow the state to regulate the product through common law tort standards of care and behavior: "The effects of the state agency regulation and the state tort suit are identical. To distinguish between them for pre-emption purposes would grant greater power (to set state standards 'different from, or in addition to' federal standards) to a single state jury than to state officials acting through state administrative or legislative lawmaking processes." (518 U.S. at p. __ [116 S.Ct. at p. 2259, 135 L.Ed.2d at p. 727].)

Justice O'Connor, joined by three other justices, concurred in part and dissented in part. Beginning with the premise that section 360k preempts any state common law action that would impose a requirement different from or in addition to federal requirements, she agreed with the majority that the plaintiffs' design claims were not preempted because the substantial equivalence test placed no requirements on the specific device. (*Medtronic, supra*, 518 U.S. at pp. __-__ [116 S.Ct. at pp. 2262-2264, 135 L.Ed.2d at pp. 730-733] (conc. and dis. opn. of O'Connor, J.).) She also agreed that violations of federal labeling and manufacturing requirements could form the basis of a state common law claim. She disagreed, however, that the state, through a common law duty, could impose labeling and manufacturing requirements different from or in addition to the federal requirements, even the generally applicable regulations. (*Id.* at p. __ [116 S.Ct. at p. 2264, 135 L.Ed.2d at p. 733].)

Even though a majority of the *Medtronic* court found no preemption, at least five of the justices concluded that state common law is preempted if it would impose a requirement different from or in addition to a federal requirement. (518 U.S. at p. __ [116 S.Ct. at pp. 2260, 2262-2263, 135 L.Ed.2d at pp. 728, 730-731] (conc. opn. of Breyer, J. and conc. and dis. opn. of O'Connor, J.).) The obvious difference between the facts of *Medtronic* and facts of this case is that the medical device in *Medtronic* was subjected only to the substantial equivalence test but the device in this case was required to undergo the complete PMA process. Accordingly, considering the Supreme Court's pronouncement that the substantial equivalence

process did not place preemptive requirements on the device in question, a critical issue in this case is whether the PMA process creates preemptive federal requirements.

Steele contends we should adopt a Ninth Circuit opinion, decided before *Medtronic*, involving the same product at issue here and the same preemption statutes and regulations applicable to this case. (*Kennedy* v. *Collagen Corp.* (9th Cir. 1995) 67 F.3d 1453 (*Kennedy*).) *Kennedy* held that state common law is never preempted under section 360k. This sweeping pronouncement was rejected by a majority of the *Medtronic* court. Justice Breyer held state requirements can include standards of care or behavior imposed through a state action of any kind, including tort. (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2260, 135 L.Ed.2d at p. 728] (conc. opn. of Breyer, J.).) Justice O'Connor, representing four votes, agreed: "I conclude that state common-law damages actions do impose 'requirements' and are therefore pre-empted where such requirements would differ from those imposed by the FDCA." (*Id.* at p. __ [116 S.Ct. at p. 2262, 135 L.Ed.2d at p. 730] (conc. and dis. opn. of O'Connor, J.).) Even the plurality declined to adopt the position taken in *Kennedy*; instead, it refused to reach the issue. (*Id.* at p. __ [116 S.Ct. at p. 2259, 135 L.Ed.2d at p. 726] (plur. opn. of Stevens, J.).) Recognizing *Kennedy*'s conflict with the majority of justices in *Medtronic*, the Ninth Circuit has recently repudiated the *Kennedy* holding: "[T]o the extent we concluded in *Kennedy* that the MDA cannot preempt *any* state common-law causes of action, the conclusion cannot survive in light of the concurring and dissenting opinions in *Medtronic*." (*Papike* v. *Tambrands Inc.* (9th Cir. 1997) 107 F.3d 737, 741, italics in original.)

Asserting the Supreme Court granted certiorari and vacated one MDA preemption case from the court of appeals while leaving another such opinion (*Kennedy*) intact by denying certiorari, Steele suggests we should attempt to discern from those actions the Supreme Court's intent concerning MDA preemption in cases involving a device that has undergone the full PMA process. ■ "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." (*United States* v. *Carver* (1923) 260 U.S. 482, 490 [43 S.Ct. 181, 182, 67 L.Ed. 361, 364], quoted in *Missouri* v. *Jenkins* (1995) 515 U.S. 70, 85 [115 S.Ct. 2038, 2047, 132 L.Ed.2d 63, 78].) Accordingly, we will not speculate concerning the intent of the Supreme Court based on its grant or denial of certiorari and will not take judicial notice, as requested by Steele, of those orders of the Supreme Court.

■ The two prime considerations in determining whether a state claim is preempted are (1) whether a state damages award on the claim would

establish a state requirement applicable to the device which is different from or in addition to a federal requirement and (2) whether the FDA has established a specific counterpart requirement for the device. (21 C.F.R. § 808.1(d) (1996); *Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2256, 135 L.Ed.2d at p. 723].)

IV

*Specific State Requirement*

Little can be applied directly from *Medtronic* to cases such as this in which the class III device has gone through the PMA process. Nevertheless, it is clear preemption does not apply to a state claim based on a manufacturer's violation of FDA requirements. All of the justices in *Medtronic* agreed on that principle. (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2255-2256, 135 L.Ed.2d at pp. 721-722] (plur. opn. of Stevens, J.); *id.* at p. __ [116 S.Ct. at pp. 2262-2263, 135 L.Ed.2d at pp. 730-731] (conc. and dis. opn. of O'Connor, J.).) Thus, if the manufacturer does not abide by a federal requirement, preemption does not prevent a state award of damages on a tort claim based on the violation of that federal requirement, even if the device has undergone the PMA process, if the state requirement is equal to, or substantially identical to, the federal requirement. (21 C.F.R. § 808.1(d)(2) (1996).) Under these circumstances, it is unnecessary for the purpose of MDA preemption analysis to determine whether the state claim imposes a requirement.

The possibility of preemption, therefore, only arises when the state claim seeks to impose a requirement specific to the device that is not already imposed by the FDA. For guidance, we turn to *Medtronic*, albeit not to the plurality opinion. We reiterate Justice Breyer's practical expression concerning state requirements, which appears to reflect the views of at least five of the justices: "[O]rdinarily, insofar as the MDA pre-empts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2260, 135 L.Ed.2d at p. 727] (conc. opn. of Breyer, J.); see also *id.* at p. __ [116 S.Ct. at pp. 2262-2263, 135 L.Ed.2d at p. 731] (conc. and dis. opn. of O'Connor, J.).)

Another district of the California Court of Appeal has held that a state common law tort cause of action does not seek to impose state requirements specific to the product. (*Armstrong* v. *Optical Radiation Corp.* (1996) 50 Cal.App.4th 580, 595 [57 Cal.Rptr.2d 763].) The court reasoned: "[T]he

state law requirements imposed by the negligence claim (e.g., the duty of a manufacturer to avoid foreseeable dangers in making a product or to inform users of potentially dangerous products of the risks involved) 'were not specifically developed "with respect to" medical devices.' (*Medtronic, Inc.* v. *Lohr, supra*, 518 U.S. at p. __ [135 L.Ed.2d at p. 725, 116 S.Ct. at p. 2258].) Rather they are 'requirements of general applicability where the purpose of the requirement relates . . . to other products in addition to [medical] devices.' (21 C.F.R. § 808.1(d)(1) (1996).) 'These state requirements therefore escape pre-emption . . . because their generality leaves them outside the category of requirements that § 360k envisioned to be "with respect to" specific devices . . . .' (*Medtronic, Inc.* v. *Lohr, supra*, 518 U.S. at p. __ [135 L.Ed.2d at pp. 725-726, 116 S.Ct. at p. 2258]; . . .)" (*Id.* at pp. 594-595.)

This reasoning ignores Justice Breyer's statement in *Medtronic*, that common law standards of care and behavior impose specific requirements, even though the general duty may not. (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2259-2260, 135 L.Ed.2d at pp. 727-728] (conc. opn. of Breyer, J.).) The *Armstrong* court espoused, essentially, the view of *Kennedy, supra*, 67 F.3d 1453, with respect to the specific state requirement element of preemption. That view, however, as reviewed above, was later repudiated by the Ninth Circuit in light of *Medtronic*. (*Papike* v. *Tambrands Inc., supra*, 107 F.3d at p. 741.) Accordingly, we follow the view of the majority of justices in *Medtronic* and the court in *Papike*. Since common law standards of care and behavior impose state requirements that may be preempted, the only remaining issue is whether such state requirements are different from or in addition to specific federal requirements. (See § 360k.)

V

*Specific Federal Requirement*

The *Medtronic* court found that state common law claims alleging liability for the manufacturing and labeling of a device but not based on the violation of a federal requirement were not preempted because the device at issue was only tested for substantial equivalence to devices already on the market. Accordingly, the state could impose its own requirements without offending the governing principles of MDA preemption. The FDA expressly warned the manufacturer of the device in *Medtronic* that this limited review did not denote official approval of the safety and effectiveness of the device; it therefore did not create a specific federal requirement. (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2254-2255, 135 L.Ed.2d at pp. 720-721] (plur. opn. of Stevens, J.).) The opposite is true of a device that has

undergone the PMA process. A PMA application is denied if there is an insufficient showing that the product is safe and effective "under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof" or if the proposed labeling is misleading in any particular. (21 U.S.C. § 360e(d)(2)(A), (B), (D).)

"All class III medical devices [not eligible for approval under the substantial equivalence test] are subject to the requirements of the MDA, including the extensive review and evaluation involved in the PMA process. Among other things, '[t]he FDA retains rigid control over the entirety of the labeling and packaging of class III products . . . .' (*King* v. *Collagen Corp.*, *supra*, 983 F.2d at p. 1135.) The control extends to the size and location of a warning on a label, as well as its content. (See, e.g., 21 U.S.C. § 360e(c)(1) and 21 C.F.R. §§ 801.4, 801.5, 801.15, 814.20(b)(10), (e) (1995).) In fact the product's sponsor must submit a proposed label to the FDA for analysis and review prior to gaining PMA for the product. (21 U.S.C. § 360e(c)(1)(F).) A PMA application will be denied if there is an insufficient showing that the product is safe and effective 'under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof,' or if the proposed labeling is misleading in any particular. (21 U.S.C. § 360e(d)(2)(A), (B), (D).)

"The MDA also imposes extensive postapproval regulations to keep the FDA apprised of any new information or safety findings relating to class III devices. (21 U.S.C. §§ 360e(e), 360i; see also 21 C.F.R. § 803 (1995).) Furthermore, under the product problem reporting program, health professionals and consumers can notify the FDA when they have had an adverse experience involving an approved medical device. The FDA may withdraw approval of the device permanently or suspend its approval temporarily at any time if it determines that the device has become unsafe or its labeling inadequate. (21 U.S.C. § 360e(e).)" (*Scott* v. *CIBA Vision Corp.*, *supra*, 38 Cal.App.4th at pp. 317-318.)

While the design or labeling of a device may be changed to enhance the safety without prior approval from the FDA, the manufacturer must submit to the FDA a PMA supplement and obtain acknowledgment from the FDA of receipt of the supplement. (21 C.F.R. § 814.39 (1996).) The device is still subject to withdrawal from the market if the FDA determines any changes have rendered it unsafe or the labeling inadequate. (21 U.S.C. § 360e(e); see also *King* v. *Collagen Corp.*, *supra*, 983 F.2d at p. 1139.)

■ Considering the differences between the substantial equivalence test and the full PMA process, a state common law tort claim relating to the

safety and effectiveness of a device is preempted to the extent it seeks to impose requirements different from or in addition to the federal requirements resulting from the PMA process, even though the approval of a device for market under the substantial equivalence test does not provide for such preemption. (21 U.S.C. § 360k(a); 21 C.F.R. § 808.1(d) (1996).) The design, manufacture, and labeling of the device, as approved by the FDA as safe and effective after the device has undergone the PMA process, are the specific federal requirements giving rise to preemption. (*Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at p. 1423; *King* v. *Collagen Corp.*, *supra*, 983 F.2d at pp. 1138-1139; *Armstrong* v. *Optical Radiation Corp. supra*, 50 Cal.App.4th at p. 593 ["[I]n approving [the product] through the PMA process, the FDA imposed federal requirements specific to that product which govern virtually every aspect of its production and sale."].) They constitute a federal regulatory standard of care.

Concerning the substantial equivalence test, the FDA promulgated the following regulation: "[A] . . . determination by the [FDA] that the device intended for introduction into commercial distribution is substantially equivalent to a device in commercial distribution before May 28, 1976, . . . does not in any way denote official approval of the device. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding." (21 C.F.R. § 807.97 (1996).) "[The] explicit statement [contained in 21 C.F.R. § 807.97] that the FDA does not officially approve 'substantially equivalent' devices creates at least the presumption—by way of the doctrine of *expressio unius est exclusio alterius*—that the FDA does officially approve those products it scrutinizes through the regular Class III PMA process. Such official approval, of course, strongly would imply that federal preemption is present." (*Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at p. 1423, fn. 6, some italics omitted.)

Accordingly, state requirements in the form of standards of care or behavior are preempted and cannot form the basis of a state common law claim for damages if they are different from or in addition to the specific federal requirements arising from the PMA process.

## VI

### *Application of MDA Preemption to This Case*

█ Even though preemption is a matter of subject matter jurisdiction that cannot be waived (*DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517, 520, fn. 1 [235 Cal.Rptr. 292, 733 P.2d 614]), the

burden of proving preemption is on the defendant. (See *Marshall* v. *Bankers Life & Casualty Co.* (1992) 2 Cal.4th 1045, 1052 [10 Cal.Rptr.2d 72, 832 P.2d 573].) Accordingly, to establish preemption, it was incumbent on Collagen Corporation to prove, by way of its statement of undisputed facts, that Zyderm was designed, manufactured, and labeled according to the specifications approved by the FDA. Most likely because the summary judgment motion was made well before the Supreme Court decided *Medtronic*, Collagen Corporation made no attempt to establish its actions were in compliance with the federal requirements. Instead, Collagen Corporation only established that Zyderm had been through the PMA process and contended that preemption necessarily followed from that fact alone.

In this situation, we cannot determine whether Collagen Corporation met the federal standard of care which emanated from the PMA process. Federal preemption is not an absolute shield. It does not dictate that there is no standard of care. Instead, it provides there is only one standard of care.

Since the facts presented by Collagen Corporation were insufficient to support summary judgment in its favor, we need not consider Steele's response to Collagen Corporation's separate statement of undisputed facts. As submitted, the motion for summary judgment was deficient and, therefore, the order granting summary judgment must be reversed. (See *West* v. *Henderson* (1991) 227 Cal.App.3d 1578, 1583 [278 Cal.Rptr. 570].)

DISPOSITION

The judgment is reversed and remanded. The parties' requests for judicial notice are denied. The parties shall bear their own costs on appeal.

Morrison, J., concurred.

**BLEASE, Acting P. J.,** Concurring and Dissenting.—I concur in the reversal of the summary judgment. However, I disagree with the majority opinion because it misreads or ignores the relevant text of *Medtronic, Inc.* v. *Lohr* (1996) 518 U.S. __ [116 S.Ct. 2240, 135 L.Ed.2d 700] (*Medtronic*), with which five justices agree.

The majority opinion reverses the summary judgment granted Collagen on the ground it failed to show that "Zyderm was designed, manufactured, and labeled according to the specifications approved by the FDA." (Maj. opn. *ante*, this page.) With this much I agree. However, this implies that the only ground upon which the product may be challenged is for lack of conformity with the FDA specifications. This amounts to a claim that the premarket

approval of a device occupies the field relating to the device, precluding state regulations which differ from the specifications. Curiously, it reaches this conclusion by reading *Medtronic* from the point of view of the dissent.

The proper test of preemption of state tort actions of general applicability, consistent with Justice Breyer's concurring views and part V of the plurality opinion, is that the Medical Device Amendments of 1976 (MDA) preempts a state law tort action only where it "actually conflicts" with a federal requirement. (See, e.g., *Medtronic, supra*, 518 U.S. at p. ___ [116 S.Ct. at p. 2261, 135 L.Ed.2d at pp. 729-730 conc. opn. of Breyer, J.)

This case arises on a summary judgment in favor of defendant Collagen Corporation (Collagen). The sole ground upon which the relief was sought was that "each and every one of plaintiff's causes of action is . . . expressly preempted under . . . 21 U.S.C. § 360k as added by the [MDA], and regulations promulgated thereunder." The principal, material, undisputed fact adduced by the defendant was that a product manufactured and distributed by Collagen, Zyderm, a class III device, had been given premarket approval (PMA) by the federal Food and Drug Administration (FDA) and "had been shown to be safe and effective for use as recommended in the submitted labeling." The only defense tendered is that premarket approval preempts any state cause of action. For this reason the allegations of the plaintiff's complaint stand unchallenged.

The allegations are exceedingly general. Little more is alleged than that Collagen designed, manufactured, tested, sold and labeled Zyderm, that the plaintiff was injected with the substance and as a result developed an autoimmune disease, and that Collagen is responsible for the injury under theories of unfair trade practices, strict liability, negligence, breach of express or implied warranty, fraud and negligent misrepresentation. Collagen did not seek to determine, by contention interrogatories or other means of discovery, in what way plaintiff contends Zyderm was designed, manufactured or labeled so as to give rise to liability. Accordingly, we are presented with an essentially abstract question of law, whether the MDA preempts the causes of action so pled. In this context it is not possible to tell whether the state claims "actually conflict" with any federal requirement.

*Medtronic* concerns the construction and application of the MDA and the implementing FDA regulations. In pertinent part the MDA (hereafter section 360k) provides that:

"§ 360k. State and local requirements respecting devices

"(a) General rule

"Except as provided in subsection (b)[1] of this section, no State . . . may establish or continue in effect with respect to a device intended for human use any requirement— [¶] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." (21 U.S.C. § 360k(a).)

In *Medtronic* the plaintiffs sought damages for injury caused by the negligent design and manufacture of a pacemaker and for failure to warn of its tendency to fail. A majority of the court, relying on FDA regulations which define the terms of section 360k, found the plaintiffs' claims were not preempted by the FDA's general rules regulating manufacturing practices and labeling requirements.

This prompted a dissent which reasoned that section 360k is clear on its face, that no resort need be made to the FDA regulations implementing section 360k, that the term "requirement" encompasses common law causes of action, that such causes are preempted to the extent their recognition would impose a requirement different from or in addition to the FDA requirements applicable to the device and that the general regulations at issue impose "comprehensive" requirements which preempt the plaintiffs' negligent manufacturing and failure-to-warn claims. (*Medtronic, supra*, 518 U.S. at p. ___ [116 S.Ct. at pp. 2262-2264, 135 L.Ed.2d at pp. 730-734] (conc. & dis. opn. of O'Connor, J.).)

The majority opinion in this case disagrees with the dissent in *Medtronic* only regarding the last claim. In particular, the majority opinion assumes that the phrase "different from, or in addition to," in section 360k, is clear and means that any variation from a federal requirement by a state requirement is preempted. This is the same as saying that the federal requirement, whatever it is, always preempts the field applicable to the device.

By contrast, both the plurality opinion in *Medtronic* and the concurring opinion of Justice Breyer found the phrase "different from or in addition to" ambiguous and deferred to the FDA regulations which define the key terms in the statute. (*Medtronic, supra*, 518 U.S. at pp. ___-___ [116 S.Ct. at pp. 2255-2256 and 2260-2261, 135 L.Ed.2d at pp. 722 and 728-729 respectively].)

---

[1]Subsection (b) provides *inter alia* that a state, upon application to the FDA, may establish regulations which are "more stringent" than the federal law.

These are found in 21 Code of Federal Regulations, section 808.1(d) (1996).[2] Of significance, they require a divergence between a specific federal requirement with respect to a device and a specific state regulation of the device. This is another way of saying there must be an actual conflict between the federal and state requirements.

Applying this test, the majority in *Medtronic,* consisting of part V of the plurality opinion, together with Justice Breyer, who joined in the part, agreed with the plaintiffs that "because only state requirements 'with respect to a device' may be pre-empted, and then only if the requirement 'relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device,' section 360k(a) mandates pre-emption only where there is a conflict between a *specific* state requirement and a federal requirement 'applicable to' the same device." (518 U.S. at p. __ [116 S.Ct. at pp. 2256-2257, 135 L.Ed.2d at p. 723], italics added.)

The court said that the MDA did not preempt the plaintiffs' negligent manufacturing and labeling claims because they did not come within the regulations. The opinion sets forth the multiple criteria, addressing inter alia the meaning of the term "requirement" as applied to both the MDA and state law. "State requirements must be 'with respect to' medical devices and

---

[2]The regulation provides in pertinent part:

"(d) State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act [21 U.S.C. § 360k] because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

"(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

"(2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

". . . . . . . . . . . . . . . . . . . . .

"(6)(i) Section 521(a) does not preempt State or local requirements respecting general enforcement, e.g., requirements that State inspection be permitted of factory records concerning all devices . . . .

"(ii) Generally, section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibition [may] be preempted." (21 C.F.R. § 808.1(d) (1996); *Medtronic, supra,* 518 U.S. at p. __, fn. 18 [116 S.Ct. at p. 2257, 135 L.Ed.2d at pp. 723-724].)

'different from, or in addition to' federal requirements. State requirements must also relate 'to the safety or effectiveness of the device . . . and the regulations provide that *state requirements of 'general applicability' are not pre-empted except where they have 'the effect of establishing a substantive requirement for a specific device.'* Moreover, federal requirements must be 'applicable to the device' in question, and, according to the regulations, pre-empt state law only if they are 'specific counterpart regulations' or 'specific' to a 'particular device.' The statute and regulations, therefore, require a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations." (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at pp. 2257-2258, 135 L.Ed.2d at pp. 724-725, italics added & fn. omitted.)

As emphasized, ". . . the regulations provide that state requirements of 'general applicability' are not pre-empted *except where they have 'the effect of establishing a substantive requirement for a specific device.'* " (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at pp. 2257-2258, 135 L.Ed.2d at pp. 724-725].)[3]

The exception dovetails with the concurring views of Justice Breyer. He asked two questions. First, does the MDA ever preempt a state law tort action? Second, if so, does the MDA preempt the particular state-law tort claims at issue here?

He answered the first question by stating that "the MDA will sometimes pre-empt a state-law tort suit" on the ground that "[o]ne can reasonably read the word 'requirement' [in section 360k] as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law." (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2259, 135 L.Ed.2d

---

[3]The majority found no reason to apply the exception to the plaintiffs' claims. Thus, the plurality opinion, in part V (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at pp. 2253-2258, 135 L.Ed.2d at pp. 719-726]), with which Justice Breyer concurred (*Id.* at p. __ [116 S.Ct. at p. 2259, 135 L.Ed.2d at p. 726]), states:

"[T]he general state common-law requirements in this case were not specifically developed 'with respect to' medical devices. Accordingly, they are not the kinds of requirements that Congress and the FDA feared would impede the ability of federal regulators to implement and enforce specific federal requirements. The legal duty that is the predicate for the *Lohrs' negligent manufacturing claim* is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products. Similarly, the predicate for the *failure to warn claim* is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a workforce. (518 U.S. at p. __ [116 S.Ct. at p. 2258, 135 L.Ed.2d at p. 725], italics added.)

at p. 727].) He did not elaborate on this point except to pose an example which appears to be a case of direct conflict between the application of a state tort rule and an MDA requirement. "Imagine that, in respect to a particular hearing aid component, a federal MDA regulation requires a 2-inch wire, but a state agency regulation requires a 1-inch wire. If the federal law, embodied in the '2-inch' MDA regulation, pre-empts the state '1-inch' agency regulation, why would it not similarly pre-empt a state law tort action that premises liability upon the defendant manufacturer's failure to use a 1-inch wire (say, an award by a jury persuaded by expert testimony that use of a more than 1-inch wire is negligent)?" (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2259, 135 L.Ed.2d at p. 727 (conc. opn. of Breyer, J.).)

Justice Breyer also said that "ordinarily, insofar as the MDA pre-empts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." (518 U.S. at p. __ [116 S.Ct. at p. 2260].) As Justice Breyer makes clear, what is at issue here is an actual conflict. That is shown in the following section which answers the second question, whether the MDA preempted the plaintiffs' state law claims.

Of significance, the two-inch wire example was again introduced in connection with a discussion of implied preemption. There Breyer pointed out that ". . . the MDA's pre-emption provision [i.e., § 360k] is highly ambiguous. That provision makes clear that federal requirements may pre-empt state requirements, but it says next to nothing about just when, where, or how, they may do so. The words 'any [state] requirement' and 'any [federal] requirement', for example, do not tell us *which* requirements are at issue, for *every* state requirement that is not identical to even *one* federal requirement is 'different from, or in addition to' that single federal requirement; yet, Congress could not have intended that the existence of one single federal rule, say about a 2-inch hearing aid wire, would pre-empt *every* state law hearing aid rule, even a set of rules related only to the packaging or shipping of hearing aids." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2260, 135 L.Ed.2d at p. 728] (conc. opn. of Breyer; J.); italics in original.)

This bears out the view that Breyer is talking about an actual conflict. If a federal rule about the length of wire in a device does not rule out a state law rule regarding packaging of the device, the federal rule does not preempt the *field* of regulation of the device. The way is open for state regulation of those matters which do not actually conflict with, i.e., which supplement, the federal requirement.

The point is made in Justice Breyer's answer to his second question, "[D]oes the MDA pre-empt the particular state-law tort claims at issue here[?]" He said the answer turns on Congress's intent. That led him to a discussion of implied preemption. He said that section 360k is "highly ambiguous" and, deferring to the regulation, that the "regulation does not fill all the statutory gaps, for its word 'divergent' does not explain, any more than did the statute, just when different device-related federal and state requirements are closely enough related to trigger preemption analysis. But the regulation's word 'specific' does narrow the universe of federal requirements that the agency intends to displace at least some state law." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at pp. 2260-2261, 135 L.Ed.2d at pp. 728-729].)

Applying this reasoning Breyer found that "[i]nsofar as there are any applicable FDA requirements here, [they] are not 'specific' in any relevant sense. . . . Hence, . . . the FDA's . . . pre-emption rule . . . does not intend these requirements to pre-empt the state requirements at issue here." (518 U.S. at p. __ [116 S.Ct. at p. 2261, 135 L.Ed.2d at p. 729].) That being the case, Breyer resorted to the law of implied preemption. (*Id.* at p. __ [116 S.Ct. at p. 2261, 135 L.Ed.2d at pp. 729-730].) He said that the court "would 'seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empt in its entirety a field related to health and safety' " and that "ordinary principles of 'conflict' and 'field' pre-emption point in the same direction. Those principles make clear that a federal requirement pre-empts a state requirement if (1) the state requirement actually conflicts with the federal requirement—either because compliance with both is impossible . . . or because the state requirement 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' . . . or (2) the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' . . . ." (*Id.* at p. __ [116 S.Ct. at p. 2261, 135 L.Ed.2d at p. 729]; citations omitted.)

Applying these principles to the plaintiffs' case, Justice Breyer said: "I can find no actual conflict between any federal requirement and any of the liability-creating-premises of the plaintiffs' state law tort suit; nor . . . can I find any indication that either Congress or the FDA intended the relevant FDA regulations to occupy entirely any relevant field." (*Medtronic, supra*, 518 U.S. at p. __ [116 S.Ct. at p. 2261, 135 L.Ed.2d at p. 730] (conc. opn. of Breyer, J.).)

I would apply the test of "actual conflict" to this case. The first question is whether the premarket approval (PMA) process results in specific federal

requirements applicable to the device under section II of Justice Breyer's *Medtronic* concurrence. I would answer with a qualified yes.[4]

The second question is whether a state law tort action invariably presents an actual conflict with those specific federal requirements. I and the majority both say no. The majority correctly concludes that a state law tort action which premises liability upon the defendant manufacturer's failure to adhere to the specific federal requirements presents no actual conflict.

I do not agree with the view that this is the only circumstance in which a state law tort suit does not present an actual conflict. An actual conflict means that compliance with both the federal requirement and the state requirement is impossible or the state requirement obstructs the accomplishment of the federal statutory objective. (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2261, 135 L.Ed.2d at p. 729] (conc. opn. of Breyer, J.).) The latter occurs when, notwithstanding the possibility of dual compliance, the state law requirement is one that has been rejected in the premarket approval process: "a case in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." (*Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2258, 135 L.Ed.2d at p. 725].)

For example, suppose the FDA promulgated a requirement in the PMA process or a regulation concerning the specific warning required for tampons about toxic shock syndrome. A plaintiff who sought to recover in a state law tort action premised on a different warning would likely be barred by preemption.[5] (See *Papike* v. *Tambrands Inc.* (9th Cir. 1997) 107 F.3d 737.) However, I would not predict the outcome without a fully developed factual record if the plaintiff tendered a claim that a warning was required as to some other different disease caused by the device. (Cf. *Medtronic, supra,* 518 U.S. at p. __ [116 S.Ct. at p. 2260, 135 L.Ed.2d at p. 728] (conc. opn. of

---

[4]The qualification is that the PMA process, although device specific, may include requirements that are too general to warrant preemption. For example, the PMA process might require that the specific device be manufactured in accord with the same kind of good manufacturing practices standards found too general to be specific requirements in *Medtronic*.

[5]I qualify this answer, because it is possible that a detailed showing of the nature of the regulation or the PMA process might lead to a judgment that the state requirement does not stand as an obstacle to attaining the federal statutory purpose. For example, a claim that the different warning was warranted by material research that was conducted after the regulation was promulgated or the PMA process completed might be tenable. (See *Medtronic, supra,* 518 U.S. at p. __, fn. 16 [116 S.Ct. at p. 2256, 135 L.Ed.2d at p. 722], noting that, notwithstanding PMA, the agency permits changes to enhance safety without prior FDA approval.)

Breyer, J.) "Congress could not have intended that the existence of one single federal rule, say, about a 2-inch hearing aid wire, would pre-empt *every* state law hearing aid rule, even a set of rules related only to the packaging or shipping of hearing aids.")

In this case there is a dearth of evidence and developed claims of actual conflict between the plaintiff's state common law tort causes of action and particularized federal requirements engendered by the PMA process. I would not rule out the prospect that some claims may be viable even if plaintiff cannot show that the defendant disobeyed standards prescribed in the federal PMA process.